UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALBERT ADAMS,

    Plaintiff,

        v.                      Civil Action No. 09-2459 (JEB)

DISTRICT OF COLUMBIA,

    Defendant.

## MEMORANDUM OPINION

Plaintiff Albert Adams, at the time an Information Technology Specialist with the District of Columbia Department of Mental Health, suffered a serious stroke in 2005. After being incapacitated for a few months in the hospital, he sought an accommodation that would allow him to keep working for DMH despite significant physical and mental after-effects. To that end, Adams spent several months negotiating an alternative work arrangement with the Department. Those talks ultimately went nowhere, however, so Adams brought this action against the District under the Americans with Disabilities Act, the federal Rehabilitation Act, and the D.C. Human Rights Act, alleging that DMH failed to provide him with reasonable accommodations while he was recovering from his stroke, discriminated against him because of his disability, and subjected him to a hostile work environment. Another court in this District dismissed Adams's intentional-discrimination and DCHRA claims, but it allowed him to commence discovery relating to the allegations in his reasonable-accommodation and hostile-work-environment counts. Discovery now complete, Defendant moves for summary judgment. Although Plaintiff's plight is regrettable, the Court must conclude that his remaining claims fail as a matter of law, and so it will grant the District's Motion in full.

1

**I.      Background**

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Albert Adams joined the District's Department of Mental Health in late 2003 as an Information Technology Specialist. In that role, he trained agency staff to use computer systems and provided in-person and virtual-help-desk support to users. See Def. Statement of Undisputed Material Facts, ¶¶ 1-2. He was also responsible for planning and implementing assignments and reporting on the efficiency of programs, among other things. See Pl. Response to Def. SUMF, ¶ 2. Travel was a key function of his position, as was speaking with others, see Opp., Exh. 1 (Deposition of Albert Adams) at 55:18-57:9, 65:5-66:7; Def. SUMF, ¶ 5, though Adams insists that neither was a "requirement." See Adams Depo. at 54:20-21.

On May 8, 2005, Adams experienced a significant stroke, which required hospitalization through July of the same year and continued medical supervision thereafter. Before his stroke, Adams had been a model employee, receiving excellent ratings from his supervisors. See Def. SUMF, ¶ 7. Afterward, however, he suffered from a variety of complications, including slurred speech, difficulty walking, memory loss, trouble focusing, and an inability to stand or sit for long periods of time. See Adams Depo. at 105:1-126:4.

About four months after the stroke, Adams's wife notified DMH that he wanted to return to work, but that he would need to telecommute. Nothing ultimately came of the request, so Adams took action, applying for Social Security disability benefits. Mot., Exh. 3 (Application for Disability Insurance Benefits). In that application, after describing his job – he mentioned, among other things, that he "traveled to various locations to train persons on computer software and hardware" – Adams represented that his "health [would] no longer allow [him] to work" and that he was "still disabled" at the time of the application. Id. at 2-3, 12. Threatened by mounting

financial obligations, he also submitted a letter to the IRS seeking discharge of unpaid taxes because he was "physically disabled and not able to work." Mot., Exh. 5 (Letter to IRS, Sept. 27, 2005). Consistent with those statements, Adams has not returned to work since his stroke.

While he sought accommodation for his disability, Adams alleges, he was made to suffer a hostile work environment at his home. In particular, he asserts that his supervisor, with whom he had discussed his disability, was "very abrasive" to his wife over the phone (though he never heard any of those conversations). See Adams Depo. at 217:22-218:20. He also claims to have felt intimidated by the same supervisor, who told Adams he was not "quite sure" if Adams would be needed in the office going forward. Id. at 228:20-229:7; 229:14-19.

The District finally decided in February 2006 that it would not allow Adams to work from home and so informed him. See 2d Am. Compl., ¶ 32-33. After properly exhausting the available administrative remedies, Adams brought this suit against the District on November 9, 2009. His Second Amended Complaint alleges three principal violations of the ADA and the federal Rehabilitation Act: first, the District intentionally discriminated against him because of his disability, see id., ¶¶ 108-21; second, it failed to provide the reasonable accommodations he requested, see id., ¶¶ 65-73; and third, it subjected him to a hostile work environment. See id., ¶¶ 98-107. The Complaint also asserts that DMH discriminated against Adams in violation of the D.C. Human Rights Act. In a 2012 Memorandum Opinion, another court in this District dismissed the intentional-discrimination count and the claims based on the DCHRA. See Adams v. District of Columbia, 740 F. Supp. 2d 173 (D.D.C. 2010). It did, however, allow the other two ADA and Rehabilitation Act claims to proceed to discovery. The case was subsequently transferred to this Court during a courtwide case reassignment in April 2012. Discovery

complete, Defendant has renewed its Motion for Summary Judgment, to which the Court now turns.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant, in other words, is required to provide evidence that would permit a reasonable jury to find in her favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III. Analysis

Adams contends both that his supervisor, Eric Strassman, promoted a hostile work environment by harassing Adams's wife and insinuating that his job might be eliminated and that the District failed to provide him reasonable accommodations after his stroke. The Court will address those two claims in sequence.

### A. Hostile Work Environment

To prevail on a hostile-work-environment claim under the ADA and the Rehabilitation Act – the standards under the two statutes are "substantively the same," see Faison v. Vance-Cooks, 896 F. Supp. 2d 37, 44 n.2 (D.D.C. 2012) – a plaintiff must demonstrate that he faced "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). That discrimination, moreover, must have been based on his membership in a protected class. Kelley v. Billington, 370 F. Supp. 2d 151, 156 (D.D.C. 2005) (citing Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998)).

In evaluating a hostile-work-environment claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). "The

5

Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" Leavitt, 407 F.3d at 416 (quoting Faragher, 524 U.S. at 788). By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted).

Even viewing the evidence in the light most favorable to Adams, the Court must find that the limited facts on the record cannot meet the "demanding standard" for a hostile-work-environment claim under federal law. See Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011). Adams bases his theory on the following evidence:

- Strassman, his supervisor, called and spoke abrasively to Mrs. Adams, see Adams Depo. at 217:16-218:20;

- Strassman told Adams that he would need to take public transportation to get to work, see id. at 218:21-219:20;

- Strassman said he was not sure if Adams's position was still needed, see id. at 228:20-229:19, this statement was "disturbing," and Adams thought Strassman was trying to get rid of him, see id. at 229:7; and

- Strassman exhibited a "disdainful attitude" toward Adams, in that he "never bothered to learn the nature of Adams's position or duties" or to explore reasonable accommodations and made it clear he was happy to do without his employee. Opp. at 24.

So, in sum, Adams alleges that his boss spoke harshly to his wife on a few occasions and made him feel unwanted as an employee. Putting aside that the worst of the purported hostility was directed not at Adams but at his wife and that Adams was confronted by those difficulties at home, not at work – two details that could scuttle the hostile-work-environment claim on their own – the law requires far more. These mild slights in no way approach the bar set for this type of cause of action; if they did, few workplaces would be entirely immune. Cf., e.g., Badibanga

6

v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff was placed on administrative leave due to false accusation, his accent was criticized, he was told he was easy to replace with an American, and he was told that his supervisor would not hire other Africans); George v. Leavitt, 407 F.3d 405, 408, 416-17 (D.C. Cir. 2005) (statements by three employees over six-month period that plaintiff should "go back where she came from," separate acts of yelling, and hostility did not rise to level of severity necessary to find hostile work environment).

Even if the treatment to which Plaintiff was subjected could plausibly occasion a hostile-work-environment claim, moreover, he has offered no facts to support the contention that the alleged mistreatment was due to his disability. Indeed, although Adams asserts that he was mistreated by his boss "based on his disability," 2d Am. Compl., ¶ 76, nothing corroborates that claim. All we learn from the record is that Strassman verbally abused Adams's wife and that he insinuated that Adams's job might be redundant; nothing in either the Complaint or the Opposition to Defendant's Motion for Summary Judgment ties these incidents to his disability. Adams does not allege, for example, that Strassman accosted his wife because her husband was disabled or because he had requested an accommodation. Nor does he offer any reason to believe that his supervisor deemed his position unnecessary even in part because he was disabled. The Court will thus dismiss Plaintiff's hostile-work-environment claim.

B. Reasonable Accommodation

In seeking summary judgment, the District also argues that Adams has failed to establish a reasonable-accommodation cause of action under the Rehabilitation Act and the ADA. To make out such a case, Adams must show that: (1) he was disabled within the meaning of the statutes; (2) his employer was aware of his disability; (3) he could have done his job with

7

reasonable accommodations; and (4) he was denied such accommodations. See 42 U.S.C. § 12112; Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994).

Adams has provided substantial evidence that he suffered a stroke in 2005, that the District was aware of his condition, and that it did not provide him with any accommodation for at least a year after he requested one. Defendant, moreover, concedes those points for the purpose of summary judgment. See Mot. at 2-3. The District, however, does contend that Adams has not presented evidence sufficient to establish the third element of his case – *i.e.*, that he could have performed his job even with reasonable accommodations.

To satisfy that requirement, Adams must show that he is a "qualified individual" for the purpose of the statutes. See 42 U.S.C. § 12112(a); Woodruff v. Peters, 482 F.3d 521, 526 (D.C. Cir. 2007). A qualified individual is "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question." Carr, 23 F.3d at 529 (citing 29 C.F.R. § 1614.203(a)(6)). An employer need not provide an accommodation, therefore, if the employee could not perform the essential functions of his job even with such an accommodation. See Woodruff, 482 F.3d at 527. Nor must an employer accommodate an individual if it would impose an "undue hardship" on the employer, as such an accommodation would not be "reasonable." See 29 C.F.R. 1630.2(o)(4).

Adams asked the District for one primary accommodation: that he be allowed to work from home. It is true that an employer must generally consider telecommuting as a potential form of reasonable accommodation. See 29 C.F.R. § 1630.2(o)(2)(ii); Carr, 23 F.3d at 530 ("in appropriate cases, [the ADA] requires an agency to consider work at home . . . as [a] potential form[] of accommodation") (citation omitted). That obligation, however, only goes so far. The typical reasonable-accommodation analysis still applies to telecommuting, and so if the job in

8

question requires that an employee leave his home – that is, if the employee can perform the essential functions of his job only by being in the office or out on the road – the employer need not grant a telecommuting request. Such accommodation may be required, conversely, if the employee can do his whole job from home – for example, if his work is entirely electronic and requires no personal interaction in the office. See, e.g., Langon v. Dep't of Health and Human Servs., 959 F.2d 1053, 1061 (D.C. Cir. 1992) (computer programmer whose work was electronic could perform essential tasks from home); Graffius v. Shinseki, 672 F. Supp. 2d 119, 127 (D.D.C. 2009) (employee whose job was to reconstruct digital databases could do same).

In this case, then, the Court in presented with three questions: First, what were the essential functions of Adams's position with the Department? Second, could he have performed those functions while working from home? And third, if he could, would allowing him to work from home have caused the District undue hardship? As the Court answers the second question in the negative, it need not address the third.

### 1. *Essential Functions of an IT Specialist*

EEOC regulations define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). In determining whether a function is essential to a particular position, the Court is to grant the employer substantial deference. See Swanks v. Wash. Metro. Area Transit Auth., 179 F.3d 929, 934 (D.C. Cir. 1999) (citing 42 U.S.C. § 12111(8)) (internal quotation marks omitted); see also 29 C.F.R. § 1630.2(n)(3) ("Evidence of whether a particular function is essential includes . . . [t]he employer's judgment as to which functions are essential."). Employers may point to a variety of evidence to support a claim that a function is essential, including "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job" and "[t]he work

9

experience of past incumbents in the job," including the plaintiff. 29 C.F.R. § 1630.2(n)(3); see also 42 U.S.C. § 12111(8).

Adams argues that he is like the plaintiffs described in the string cite above, whose jobs were wholly electronic. As far as he is concerned, the only requirements of his job were that he complete reports and man the Department's help desk, two tasks he could complete electronically, and therefore remotely. The District, however, has presented an impressive array of evidence proving that the essential functions of an IT specialist included tasks that either necessitated travel or required Adams to speak to people on the phone and sit at a desk for long periods, all things he could not do competently after his stroke and thus that no accommodation would have made possible.

The District shows, for example, that IT Specialists are expected to travel to various sites to train staff in the use of computer technology. In support of that position, it points first to the job description for the IT Specialist position, which lists "train[ing] staff" as a major duty. See Mot., Exh. 2 (DMH Information Technology Specialist Duties) at 1. At his own deposition, moreover, Adams testified that he traveled at least once per week to do that training. Adams Depo. at 95:2-16. And in his sworn application for Social Security benefits, he averred that his day-to-day activities included "teach[ing] classes on computer software and hardware" and "travel[ing] to various locations" to teach. If those responsibilities were not required, it would not have made sense for Adams to list them in a sworn statement describing what he "d[id] all day," Social Security Application at 12, and how his disability limited his ability to complete his work. Taken together, these bits of evidence indicate that training and travel were essential functions of the IT Specialist position.

In the face of this compelling evidence, Adams changes his tack at the summary-judgment stage, now arguing that travel was a voluntary and "ad hoc" part of his job. Adams Depo. at 57:12, 252:21-254:1. He neither offers an explanation for the discrepancy between his Social Security application and the statements he made at his deposition, however, nor suggests that travel had not been a part of his job in the past. To be fair, Adams does point out that he was not training staff at the time of his stroke, but a snapshot of his duties at one point in nearly three years on the job can hardly undermine the significant evidence on the other side of the ledger. Indeed, the experience of a past incumbent (Plaintiff), the IT Specialist job description, and Adams's own statements are probative of the position's essential functions, and the Court finds nothing in the record to create a material issue of fact on the question.

Defendant similarly convinces the Court that, as an IT Specialist, Adams would have been required to communicate orally with customers and other Department staff. Indeed, oral communication was one factor on which the Department evaluated Adams before his stroke, see Mot., Exh. 4 (Report of Adams's Performance Rating, June 30, 2004) at 1, and IT Specialists at the Department have in the past been required to answer phones at the Department's help desk and participate in meetings, conferences, and committees. IT Specialist Duties at 1. Adams replies that he could have completed some of these tasks without communicating orally – for example, that he could operate a help desk by e-mail. Such an accommodation, however, would alter the purpose and effectiveness of the help desk, as assistance would no longer be as prompt – and, indeed, would no longer be rendered in real time at all. Allowing Adams to work the help desk electronically, moreover, would have been of no help if he had to lie down frequently, see Social Security Application at 11, or when it came time to attend meetings and conferences outside his home.

11

As a result, the Court concludes that, as a D.C. Department of Mental Health IT Specialist, Adams was required to travel for work and to communicate orally – and to sit in front of a computer for long periods – at the help desk, among other times.

2. *Plaintiff's Ability to Perform Essential Functions*

Although Adams spends many pages attacking those conclusions, he makes little effort to persuade the Court that he could handle those functions if they were indeed deemed essential. He admitted at his deposition, for example, that he could not train staff from home or travel from home to do so. See Adams Depo. at 124:6-11 (Q: "And you couldn't train people from home . . . [or] go to the customers or the client's site to help with the training, correct, from home?" A: "No, I could not."). Adams allowed, furthermore, that his speech remained slurred for years after the stroke and that during that period, people were not able to understand him and communicating over the phone would have been "very difficult" for him. See id. at 251:19-252:8; 221:10-19. And Plaintiff appears to have given up the ship in his application for Social Security disability benefits when he stated that he "became unable to work because of [his] disabling condition" and that he was "still disabled." Social Security Application at 1. When asked why he stopped working, Adams responded, "My health will no longer allow me to work." Id. at 12.

To be sure, those assertions are not dispositive, as "pursuit, and receipt, of [Social Security Disability] benefits does not automatically estop the recipient from pursuing an ADA claim" or even create "a strong presumption against the recipient's success under the ADA." Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 797-98 (1995). After all, a "representation of total disability [in the Social Security context] . . . often implies a context-related legal conclusion, namely, 'I am disabled <u>for purposes of the Social Security Act</u>.'" Id. at 802

12

(emphasis added). In other words, because a person may be eligible for Social Security benefits even if he could return to work with certain accommodations, it is entirely consistent for a plaintiff to argue at once that he is both totally disabled for Social Security purposes and able to work – if provided reasonable accommodation – for the purpose of the ADA inquiry. See Whitbeck, 116 F.3d at 588 ("Whitbeck's statement that she was no longer able to perform her job might be nothing more than an accurate description of her condition – without accommodation, she was unable to work.").

Here, however, Defendant does not argue that Adams could not qualify under the ADA merely because he sought and received Social Security benefits. The District instead cites Adams's Social Security application for the sworn factual admissions he made therein. When a defendant claims a bar based on previous factual assertions that are inconsistent with an ADA claim, a plaintiff "cannot simply ignore" his previous statements to the Social Security Administration. Instead, he "must explain why that [Social Security] contention is consistent with" the subsequent assertions made in connection with the ADA claim. Cleveland, 521 U.S. at 798. In short, an ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an about-face and assert that he is a qualified individual who is capable of working. Rather, the plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of his job. Solomon v. Vilsack, 628 F.3d 555, 567 (D.C. Cir. 2010) (citing Cleveland, 526 U.S. at 807).

At bottom, then, courts are instructed to simply apply the standard summary-judgment analysis to situations like this one. If there are factual statements on the record that compel a finding against Plaintiff as a matter of law, they "must be given controlling weight" – and the

13

Court must grant summary judgment to Defendant – unless other facts on the record call that conclusion into doubt. Swanks v. Washington Metro. Area Transit Auth., 116 F.3d 582, 587 (D.C. Cir. 1997) (internal quotation marks omitted).

Adams made just that sort of statement in his application, claiming that he "cannot walk without the assistance of a walker," that he "has to lie down all the time because he becomes weak and cannot stand or walk for more than 10 minutes," that "[t]he left side of his body is paralyzed and as a result he does not have control over the left side of his body," that "[h]is tongue aches, feels heavy and thick and as a result his speech is slurred," that "[h]is cognitive abilities have been diminished due to the stroke," and that his job entailed travel and oral communication. Social Security Application at 12-15.

Adams's condition, as he described it, would have made it impossible for him to do the job of an IT specialist. As the Court has found, the job required Adams to travel to various locations, to communicate over the phone with customers, and to sit in front of a computer for long hours. Adams, however, had mobility issues, see Adams Depo. at 107:3-19, found it difficult to communicate orally, see id. at 110:9-10, and had to lie down frequently. See Social Security Application at 12-15. Each of these symptoms would have prevented him from doing the job he was hired to do.

To qualify under the ADA, then, Adams would have to assert facts that would directly conflict with the statements in his Social Security application that show he was not capable of fulfilling the essential functions of his job. He has offered the Court no reason to credit his present statements over those in his Social Security application – he has not informed the Social Security Administration of his renewed abilities, for example, which is required if his status changes, see Social Security Application at 4-5 – and, as a result, the Court has no reason to

believe that the statements in his Social Security application were not and are not an accurate description of his physical and mental condition. In these circumstances, the Court concludes that Adams had the disabilities described in that previous statement. And, indeed, those disabilities would have prevented Adams from doing his job even if the District had allowed him to work from home. See Opsteen v. Keller Structures, Inc., 408 F.3d 390, 392 (7th Cir. 2005) (rejecting plaintiff's ADA claim where factual representations plaintiff made in his Social Security disability application showed he was unable to do the job for which he was requesting accommodation); Swanks, 116 F.3d at 587 ("ADA plaintiffs who in support of claims for disability benefits tell the Social Security Administration they cannot perform the essential functions of a job even with accommodation could well be barred from asserting, for ADA purposes, that accommodation would have allowed them to perform that same job.").

3. *Plaintiff's Counterarguments*

Plaintiff marshals three principal counterarguments in support of his reasonable-accommodation claim. First, he posits that the District "appears to have conceded" that he could do his job because "[Strassman] . . . attempted to place Mr. Adams in a position in which he would be exclusively writing reports." Opp. at 15. That is, although the Court has concluded that an IT Specialist must travel to train staff and communicate orally when working the help desk – functions that Adams could no longer perform – he contends that, after his stroke, his newly defined job actually required nothing more than report writing, a job he could complete without trouble at home. He was given those diminished responsibilities, however, only after the Department's human-resources staff asked Strassman to find work that Adams could do despite his disability. Opp., Exh. 6 (Deposition of Eric Strassman) at 69:15-20, 102:20-103:2. Defendant's statement thus actually proves the opposite of what Adams claims. Indeed, it was

15

precisely because Adams could not do his full job after his stroke even with accommodations that the Department tried to find him other work. That such work did not pan out is inconsequential, as neither the ADA nor the Rehabilitation Act requires that an employer create a new position to accommodate a disabled employee, even if he is a qualified individual as to that new job. See Carter v. Tisch, 822 F.2d 465, 467 (4th Cir. 1987). Had the District not even made an effort to accommodate Adams, then, he would have had no recourse; the fact that it tried and failed cannot change that, as "an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1257 n.3 (11th Cir. 2001). There is, of course good reason for the District to have tried to help Adams out of a jam. Indeed, the Court is sympathetic to his plight. Unfortunately, the law requires nothing more of Defendant, and so these facts are of no help to his legal cause.

Next, Plaintiff points to the opinion of his treating physician, Dr. Khosrow Davachi, who stated on the record that Adams could perform certain jobs despite the limitations stemming from his stroke. Davachi's opinion, however, is unhelpful to Plaintiff for two reasons. First, much of that opinion amounts to legal conclusions on which Plaintiff's doctor is anything but authoritative. See, e.g., Pl. Response to Def. SUMF, ¶ 1 ("[A]fter examining [Adams] and reviewing the position description, [Davachi] concluded that travel is not essential to the functions of [Adams's position]."). And second, Davachi did not make his opinion on Plaintiff's condition known until October 2006, more than a year after Plaintiff's September 2005 request for accommodation and eight months after the District had denied that request. (The doctor did submit one letter on Adams's behalf in October 2005, before the denial, but it contained nothing more than generalities that are unhelpful to Adams's case. See Mot., Exh. 6 (Letter from

16

Davachi to DMH, Aug. 25, 2005)). Perhaps Adams means to suggest that his status has changed since the District made its decision in February 2006, but he does not make that claim explicit, nor does the Government have any duty to revisit the issue once it has made its final determination not to accommodate him. See, e.g., Basden v. Professional Transp., Inc., 714 F.3d 1034, 1037 (7th Cir. 2013) ("[Plaintiff's] ability . . . [to] perform the essential functions of her job[] is examined as of the time of the adverse employment decision at issue."). The courts, after all, must be wary of punishing employers for effectively postponing the effective date of denial by doing their utmost to help their disabled employees.

Finally, Plaintiff submits that the Court should consider a 2006 "letter of determination" from the D.C. Office of Human Rights, which concluded that there was "probable cause" to conclude that he was an ADA-qualified individual. Opp. at 34-35, 43-44. That letter, he suggests, is "evidence to be taken into account," although he concedes the Court must examine the case *de novo*. Id. (quoting Langon, 959 F.2d at 1061). The Court takes the letter into account, but the legal conclusions of one District employee do not call into question the mountain of primary materials and sworn testimony in this case. Cf. Scott v. Johanns, 409 F.3d 466, 470 (D.C. Cir. 2005) (holding that administrative findings on employment discrimination may be admitted as evidence, but are not determinative, in federal agency employee's discrimination lawsuit). Accordingly, the DCOHR letter does not alter the preceding analysis.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment in full. A contemporaneous Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: June 27, 2014